

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**DEREK ELLIOT TICE,**

      Petitioner,

v.                                          Civil Action No. 3:08CV69

**GENE JOHNSON,**

      Respondent.

## MEMORANDUM OPINION

Derek Elliot Tice, a Virginia prisoner, brings this petition for a writ of habeas corpus challenging his convictions, in the Circuit Court for the City of Norfolk ("the Circuit Court") for the murder and rape of Michelle Bosko. Tice contends that he was denied his right to the effective assistance of counsel because:

| Claim One | Counsel failed to move to suppress Tice's June 25, 1998 confession on the ground that such confession was made after Tice had invoked his right to remain silent. |
|---|---|
| Claim Two | Counsel failed to introduce a letter wherein Omar Ballard admitted to killing Michelle Bosko. |
| Claim Three | Counsel failed to present expert testimony to demonstrate that the crime was committed by one person. |

Respondent has moved to dismiss. For the reasons set forth below, the motion to dismiss will be granted with respect to Claims Two and Three and denied with respect to Claim One. Tice will be granted habeas relief with respect to Claim One.

## I. HISTORY OF THE CRIME AND SUBSEQUENT PROCEEDINGS

A fulsome discussion of the crimes and the unusual course of the investigation is necessary to properly assess Tice's claims. Specifically, although the police progressively

obtained confessions from four men who admitted to committing the crimes against Michelle Bosko, the confessions repeatedly failed to square with each other or the biological evidence recovered from the victim's person. Eventually, five men were convicted with respect to crimes against Michelle Bosko: Derek Tice, Danial Williams, Joseph Dick, Eric Wilson, and Omar Ballard. Nevertheless, because of the continuing lack of certainty that any of these men besides Ballard participated in the rape and murder of Michelle Bosko, Governor Timothy Kaine recently commuted the sentences of Tice, Williams, Dick, and Wilson.

On July 8, 1997, William Bosko returned to his home in Norfolk from a Navy cruise. He found his wife, Michelle Bosko (hereinafter "Michelle"), murdered in the bedroom of their apartment. The police investigation quickly focused on the Boskos' neighbor, Danial Williams. On July 9, 1997, after questioning by the police, Williams confessed to raping and stabbing Michelle. Williams's statement indicated that he acted alone in raping and murdering Michelle.

Jerry Sellers, a forensic scientist employed by the Commonwealth, had recovered several biological samples, which he deemed suitable for DNA testing: a vaginal swab from Michelle, a spermatoza stain on a white blanket that was covering Michelle's body, and material from underneath Michelle's fingernails. In late December of 1997, DNA testing conclusively eliminated Williams as the source of DNA found at the crime scene. Investigators turned their attention to Williams's roommate, a sailor, Joseph Dick. Dick initially denied any involvement in the crime and stated that he was on duty on board his ship on the date of the murder. Dick eventually admitted that he participated in raping and murdering Michelle with Williams.

A few months later, DNA testing eliminated Dick as the source of DNA found at the crime scene. After further questioning by the police, Dick told the police that Eric Wilson, a

2

friend of Williams, also had raped Michelle. Wilson initially denied participation in the crime, but soon Wilson admitted to having raped Michelle with Dick and Williams. On June 10, 1998, DNA testing eliminated Wilson as the source of the DNA found at the crime scene.

On June 16, 1998, Dick provided another statement to the police wherein he indicated another individual was involved in the rape and murder and that he believed this man was named George Clark. Dick later picked out a photograph of Tice as the man he had identified as George Clark. On June 18, 1998, Tice was arrested in Florida. On June 25, 1998, Tice was brought to Norfolk and questioned by Detectives Ford and Ray. Tice initially denied involvement in the rape and murder. Tice, however, soon confessed to his involvement in the crime. Tice stated that he had committed the crime with Williams, Wilson, Dick, Geoffrey Farris, and Rick Pauley. In August of 1998, however, DNA testing eliminated Tice, Farris, and Pauley as the source of the DNA found at the crime scene. Nevertheless, criminal charges were pursued against Farris and Pauley.

Tice entered into plea negotiations with the prosecutor. Tice's plea agreement required him to testify against his codefendants and identify the individual whose DNA was found at the crime scene. In exchange for this cooperation, the prosecutor agreed to drop the death penalty. As part of his plea agreement, Tice agreed to submit to further questioning by the police. On October 27, 1998, Tice provided a statement to the police wherein he identified "CJ" John Danser as the seventh participant in the rape and murder of Michelle. Tice stated that he had not named Danser earlier because he and Danser were good friends. The police then arrested Danser in conjunction with Michelle's rape and murder.

3

On November 5, 1998, the police again interviewed Tice. Detective Ford confronted Tice with the fact that his statement implicating Danser was inconsistent with hotel records. Tice then stated Danser was not involved in the murder. Tice stated that he did not know the other individual involved in the murder, but that the individual already was at Williams's house on the night of the murder when Tice arrived. Detective Ford told Tice that all they wanted was the truth and that was all they had ever wanted. Tice then told Detective Ford that he would tell him the truth and that the seventh individual was a black male 5'9" to 5'10" with a kind of muscular build. Tice stated that the only one who knew the black male was Williams. Tice explained that he had not identified the black male earlier because they were all scared of him. When pressed as to why he had not brought up the black male earlier, Tice then stated there was no black male and he did not know who the seventh man was because he was not there.

On December 28, 1998, Tice testified at Danser's preliminary hearing. Tice explained that he had not named Danser at his initial questioning because he was trying to protect Danser. When questioned about other inconsistences in his statement, Tice explained that he wanted there to be "too many false statements" so that he "wouldn't be implicated." (Danser Dec. 28, 1998 Tr. 14.)

On January 22, 1999, Williams pleaded guilty to the murder and rape of Michelle.

In early 1999, while serving a prison sentence for rape and malicious wounding, Omar Ballard, a black male, wrote a letter (hereinafter, "the Ballard letter") to a friend, Karen Armstrong. Ballard demanded that Armstrong send him money and lurid photographs of herself. Ballard threatened to kill her if she did not comply. Ballard volunteered that he had killed Michelle:

4

> Remember that night [I] went to Mommie's house and the next morning Michelle
> got killed guess who did that, Me HA, HA, It wasn't the first time . . . . [I]f I was
> out I would have killed that Bitch down the street from you too . . . .

(Petr.'s State Habeas Pet. Ex. 21, Attach. 1.)  On February 22, 1999, Detective Ford received a

copy of the Ballard Letter.  Detectives Ford and Peterson then questioned Ballard about his

involvement in the murder and rape of Michelle.  Ballard told them to bring some proof of his

involvement before he would talk to them.

On March 4, 1999, the Commonwealth's forensic lab informed Detective Ford that

Ballard's DNA matched DNA recovered from the scene of Michelle's murder.  On March 11,

1999, upon questioning by Detectives Ford and Peterson, Ballard admitted that he had raped and

stabbed Michelle.  Ballard denied that any other individuals were involved in the rape and

murder.

On April 21, 1999, Dick pled guilty to the murder and rape of Michelle.  On May 7, 1999,

Tice rejected his plea agreement.  Shortly thereafter, the prosecutor dropped the charges against

Danser, Pauley, and Farris.  In June of 1999, a jury found Wilson guilty of rape and acquitted him

of the murder Michelle.

On February 14, 2000, Tice was found guilty of the rape and capital murder of Michelle.

Tice was sentenced to life in prison.

On March 15, 2000, Ballard met with Detectives Ford and Peterson and made a

statement.  During the course of this statement, Ballard stated that he had committed the rape and

murder of Michelle with Williams, Dick, Tice, and Wilson.  On March 22, 2000, pursuant to a

plea agreement, Ballard pled guilty to the rape and murder of Michelle.

5

On May 21, 2002, the Court of Appeals of Virginia found that the jury had been improperly instructed and reversed Tice's convictions for capital murder and rape. *Tice v. Commonwealth*, 563 S.E.2d 412 (Va. Ct. App. 2002).

Following a second jury trial in January of 2003, after two days of deliberation, Tice again was found guilty of rape and capital murder. The Supreme Court of Virginia summarized the evidence at Tice's trial as follows:

> At Tice's trial, the Commonwealth contended that Tice was one of several men who had raped and murdered Michelle Moore-Bosko (Michelle). Tice's attorneys, however, maintained that Omar A. Ballard was the sole perpetrator of the crimes committed against Michelle.
>
> The evidence showed that on July 8, 1997, William A. Bosko returned to his apartment in Norfolk after a tour of duty with the United States Navy and found the dead body of his wife, Michelle. Michelle had died from manual strangulation and multiple stab wounds to the chest. The evidence further revealed that Michelle had suffered "forcible injuries" to her vaginal area.
>
> City of Norfolk police officers found a blood-stained, serrated knife near Michelle's body. The police also recovered some DNA samples from Michelle's vagina and from a blanket on the bed. Robert Scanlon, a forensic scientist, testified that Tice was eliminated as the source of this DNA evidence. Scanlon's testimony further revealed a very high correlation between these DNA samples collected at the crime scene and the DNA sample obtained from Ballard.
>
> The jury also heard the testimony of Joseph Dick, who had participated in the rapes and murder of Michelle and had entered into a plea agreement with the Commonwealth. Dick testified that at the time the crimes against Michelle were committed, he lived across the hall from Michelle's apartment with Danial Williams. Dick stated that on the night of Michelle's death, he was present at Williams' apartment with Williams and five other men, including Tice, Eric Wilson, Richard Pauley, Geoffrey Farris, and John Danser.
>
> Dick testified that during a group conversation, he heard Williams state that he would like to see Michelle's "panties." After further discussion, the seven men knocked on Michelle's apartment door, but Michelle directed them to leave.
>
> Dick testified that the men walked to a parking lot where Ballard, a man Dick did not know, joined the group. According to Dick, the men, including Ballard, returned to Michelle's apartment and knocked on the door again. Michelle opened the door, and the eight men forced their way into the apartment and carried Michelle to the bedroom. Dick testified that each man assisted in restraining Michelle, and that all the men, including Tice, had forcible sexual intercourse with her.

6

Dick further testified that each man, including Tice, took turns stabbing Michelle with a knife obtained from her kitchen. After the men left Michelle's apartment, they "made a pact not to say anything" about the crimes and not to "turn each other in." Dick stated that he entered into this "pact" because he was afraid of Ballard.

Dick acknowledged in his testimony that he originally was charged with capital murder and that as a result of his plea agreement, he had been convicted of first-degree murder. In the plea agreement, Dick promised to cooperate in the police investigation and to testify truthfully against all others charged with the crimes.

Dick testified that he gave an initial account to the police that contained some false statements but, that after further police questioning, he admitted being present with Williams when Williams raped Michelle. In a second conversation with the police, Dick told the police that he also had raped Michelle. Dick testified that he informed the police that he, Williams, and Eric Wilson had committed the crimes. Dick admitted in his testimony, however, that he had lied to the police in that second interview about other details of the crimes.

Dick further testified that in a third conversation with the police, he related that there were six men who each raped and stabbed Michelle but that he did not know all their names. Dick additionally stated that he had identified Tice as one of the perpetrators based on a photograph shown from a Navy yearbook, and that he had met Tice only once before the night of Michelle's death.

Dick admitted in his testimony that during this third police interview, he again provided inaccurate details of the crime to the police. Also, Dick admitted that he had written a letter to a member of the media in which he denied involvement in the crimes and claimed that he was pressured by the police to confess. Dick explained that he had written the letter containing those false statements in an attempt to generate media attention and to help his own case.

Detective Robert G. Ford testified that after Dick identified Tice as one of the perpetrators, the police arrested Tice in Florida. Ford stated that when Tice arrived at the police station in Norfolk, Ford advised Tice of his *Miranda* rights, and that Tice waived these rights and indicated that he wanted to speak with the police.

Ford further testified that Tice initially denied participating in the crimes but acknowledged that he knew Williams and was aware that Williams had been arrested. Ford stated that he and Detective Brian Wray continued to question Tice, who eventually began crying and relating details of the crimes. At this time, Tice stated that he, Williams, Wilson, Dick, Farris, and another man whose name Tice did not know, all participated in the crimes. Tice ultimately advised Ford that Pauley also participated in the crimes, and stated that each of the men raped Michelle and stabbed her with a knife obtained from the kitchen. Tice added that Williams desired to rape Michelle first because she was Williams' "trophy."

Ford made a tape recording of Tice's statement, and a transcript of that statement was admitted into evidence. In the recorded statement, Tice explained that

7

before the murder, all the men agreed to participate in raping and murdering Michelle so that each would be culpable for the crimes.

Ballard was served with a subpoena to appear at Tice's trial but refused to testify. However, Detective David M. Peterson testified regarding the contents of three statements that Ballard made to the police.

Peterson testified that after he learned that Ballard's DNA sample "matched" the DNA samples found in Michelle's apartment, Peterson interviewed Ballard, who was incarcerated for another crime. Ballard claimed that he was alone with Michelle in her apartment on the night in question and that, after they engaged in consensual sexual intercourse, something in Ballard "ticked" causing him to obtain a knife from the kitchen and stab Michelle. Ballard also told Peterson that Michelle had informed him that Williams was "stalking her."

Peterson testified that when he interviewed Ballard a second time, Ballard admitted that he had raped Michelle, and that he had choked and stabbed her. Ballard further admitted writing a letter (the Ballard letter) to a friend stating that he had murdered Michelle. When Tice's counsel asked that the Ballard letter be admitted into evidence, the circuit court sustained the Commonwealth's objection.

Peterson also testified that he spoke with Ballard a third time, after Ballard pleaded guilty to the rape and murder of Michelle.[1] At that time, Ballard admitted being present at Michelle's apartment complex on the date of her death and hearing a group of four men, including Williams, discussing an attempt to enter Michelle's apartment. Ballard stated that he helped the men enter Michelle's apartment and that, after entering, they all raped and stabbed Michelle.

Tamika Taylor testified that Michelle was her closest friend and that on nights when Michelle's husband was away from home, Taylor and Michelle usually stayed together in Michelle's apartment. Taylor related that Williams "constantly" knocked on Michelle's door when Michelle's husband was not at home and asked to use Michelle's telephone. Taylor stated that Williams also would often "peep" through his window in an apparent attempt to observe Michelle walking in the hallway.

Taylor testified that she spent the night [of July 6, 1997] at Michelle's apartment the night before Michelle's death and left about 7:00 a.m. At that time, Ballard, a friend who often visited Michelle and Taylor early in the morning, was still present in Michelle's apartment.

*Johnson v. Tice*, 654 S.E.2d 917, 920-21 (Va. 2008). Tice was not successful in overturning his

convictions on his direct appeal.

---

[1] Respondent has acknowledged that, contrary to Detective Peterson's testimony, Ballard gave this statement shortly before Ballard's guilty plea.

On September 14, 2005, Tice filed a petition for a writ of habeas corpus with the Circuit Court. The Circuit Court conducted an extensive evidentiary hearing and dismissed the majority of Tice's grounds for habeas relief. The Circuit Court, however, concluded that Tice's counsel were deficient for failing to move to suppress Tice's June 25, 1998 confession on the meritorious ground that Tice had invoked his right to remain silent. The Circuit Court further concluded that there was a reasonable probability that Tice would have been acquitted had the confession been suppressed and therefore granted Tice habeas relief.

The parties appealed to the Supreme Court of Virginia. That appeal encompassed the three claims for habeas relief that are the subject of the present federal petition for a writ of habeas corpus. With respect to Claim One, the Supreme Court concluded that Tice could not demonstrate prejudice and reversed the Circuit Court's grant of habeas relief.[2] The Supreme Court of Virginia affirmed the Circuit Court's rejection of Claims Two and Three. Thereafter, Tice filed the present 28 U.S.C. § 2254 petition with this Court.

## II. THE APPLICABLE CONSTRAINTS UPON FEDERAL HABEAS CORPUS REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, this Court's warrant to grant relief by way of a writ of habeas corpus is circumscribed by 28 U.S.C. § 2254(d) and § 2254(e)(1). Section 2254(e)(1) provides that, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (*citing* 28 U.S.C. § 2254(e)(1)).

---

[2] With respect to Claim One, the Supreme Court of Virginia did not address whether counsel were deficient.

9

Under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any

claim that was adjudicated on the merits in state court unless the adjudicated claim:

> (1)  resulted in a decision that was contrary to, or involved an
>       unreasonable application of, clearly established Federal law,
>       as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable
>       determination of the facts in light of the evidence presented in
>       the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision is an "unreasonable application" of Supreme Court

law "if the state court correctly identifies the governing legal principle . . . but unreasonably

applies it to the facts of the particular case." *Bell v. Cone,* 535 U.S. 685, 694 (2002). The

Supreme Court has held that "a federal habeas court making the 'unreasonable application'

inquiry should ask whether the state court's application of clearly established federal law was

objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000). The Supreme Court

has emphasized that for a petitioner to demonstrate the state court's determination was

unreasonable requires "a substantially higher threshold" showing from a petitioner. *Schriro v.*

*Landigran*, 550 U.S. 465, 473 (2007) (*citing Williams*, 529 U.S. at 410).[3] Further, "when

assessing the reasonableness of the state court's application of federal law, the federal courts are

to review the result that the state court reached, not whether [its decision] [was] well reasoned."

*Larry v. Branker*, 552 F.3d 356, 365 (4th Cir. 2009) (alterations in original; internal quotations

omitted).

---

[3] In light of the foregoing statutory structure, the findings of the Supreme Court of
Virginia and the Circuit Court figure prominently in this Court's opinion.

With respect to Claim One, Tice contends that the deference required by § 2254(d) does not apply to the Supreme Court of Virginia's decision that he had not established prejudice, because, according to Tice, the Commonwealth did not raise the issue of prejudice with respect to Claim One on collateral appeal to the Supreme Court of Virginia. Tice is wrong.[4] Because Claim One was presented to the Supreme Court of Virginia and that court adjudicated the issue of prejudice, the deferential standard of review set forth in § 2254(d) applies to the prejudice component of Plaintiff's ineffective assistance of counsel claim. *Fisher v. Lee*, 215 F.3d 438, 445-46 (4th Cir. 2000).[5]

Tice also contends that the Circuit Court's decision that he demonstrated deficiency on the part of counsel with respect to Claim One is entitled to deference under 28 U.S.C. § 2254(d)(1). Tice is wrong. *See Daniels v. Lafler*, 501 F.3d 735, 740 (6th Cir.), *cert. denied*, 128 S. Ct. 1654 (2007). The "AEDPA's standard of review is 'a precondition to the grant of habeas relief ("a writ of habeas corpus . . . shall not be granted" unless the conditions of § 2254(d) are met), not an entitlement to it.'" *Id.* (alteration in original) (*quoting Fry v. Pliler*, 551 U.S. 112, 119 (2007)). Because there is no adverse state court decision with respect to the issue of deficiency, this Court's review of that aspect of Claim One is *de novo. See id.*; *see also*

---

[4] On appeal, Respondent assigned as error that: "The habeas court erred in concluding that the petitioner had demonstrated the prejudice prong of *Strickland* test for counsel's failure to seek the suppression of the petitioner's initial confession on the ground that it was obtained in violation of Tice's right to remain silent." (Resp. State Habeas App. Br. 2.)

[5] Tice complains that the Supreme Court of Virginia reversed the Circuit Court's decision on a theory of prejudice that was not advanced by the Commonwealth on appeal. To the extent that Tice believed he had been denied an adequate opportunity to present his case to the Supreme Court of Virginia, he was free to move for a rehearing under Virginia Supreme Court Rule 5:39.

11

*Wiggins v. Smith*, 539 U.S. 510, 534 (2003). In light of the complexity of the analysis surrounding Claim One, it is appropriate to first address Claims Two and Three.

### III. FAILURE TO INTRODUCE THE BALLARD LETTER

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that to demonstrate the ineffective assistance of counsel, a defendant first must show that counsel's representation was deficient and, then, must establish that the deficient performance prejudiced the defense. *See id.* at 687. To satisfy the deficient performance facet of *Strickland*, the defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (*quoting Strickland*, 466 U.S. at 689). Prejudice requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to "determine whether counsel's performance was deficient before examining the prejudice" issue. *Id.* at 697.

In Claim Two, Tice faults counsel for failing to introduce the Ballard Letter.[6] The Court agrees with the Supreme Court of Virginia that Tice has not demonstrated prejudice by the omission of the letter which was largely "cumulative of other evidence of Ballard's commission of the crimes." *Johnson v. Tice*, 654 S.E.2d 917, 925 (Va. 2008).

> Although Ballard refused to testify at Tice's trial, Ballard's statements to Detective
> Peterson that were admitted into evidence contained an admission that Ballard wrote

---

[6] At his initial trial and retrial, Tice was represented by James Broccoletti and Jeffrey Russell.

12

> a letter to a friend stating that he had killed Michelle. In addition, the jury heard testimony from Detective Peterson that Ballard made three other admissions that he had murdered Michelle, and also admitted twice that he had raped her. Therefore, we hold that the exclusion of this cumulative evidence did not constitute prejudice under the *Strickland* standard. *See Snow v. Sirmons*, 474 F.3d 693, 729 (10th Cir. 2007); *Huffington v. Nuth*, 140 F.3d 572, 581 (4th Cir. 1998); *Hunt v. Nuth*, 57 F.3d 1327, 1333 (4th Cir. 1995).

*Id.* Moreover, Ballard's statements, admitted through Peterson, were more favorable to Tice than the letter. For example, in his March 4, 1999 statement, Ballard denied that anyone else had participated in the crime and specifically denied that the seven other people who had been charged with the crime had been involved. Accordingly, Claim Two will be DISMISSED.

## IV. FAILURE TO INTRODUCE EXPERT TESTIMONY

In Claim Three, Tice faults counsel for failing to offer experts in the fields of DNA, forensic pathology, and crime scene reconstruction to expose flaws in the prosecution's theory that eight men committed the crimes against Michelle. (Pet. ¶ 82.) With respect to forensic pathology and DNA analysis, counsel were able to successfully utilize the Commonwealth's own experts to elicit favorable evidence that undermined the prosecution's theory that the crime was committed by eight individuals. Additionally, because of the involvement of these experts in the investigation of the crime, they were in a unique position to support the defense's assertion that the prosecution had concocted the theory that eight people participated in the crime to explain the police's prolonged inability to identify the sole perpetrator, Ballard. For example, Dr. Kinnison, the medical examiner, acknowledged that at the time she conducted the autopsy of Michelle on July 8, 1997, she knew the police had only one suspect in custody for the murder, Danial Williams. (Jan. 28, 2003 Tr. 45-47.) Dr. Kinnison acknowledged that the results of her autopsy and examination were "consistent with one person" as the perpetrator and she would have

13

informed the investigating authorities if she had found signs that suggested the injuries to Michelle had been inflicted by more than one person. (Jan. 28, 2003 Tr. 45-47.) Additionally, Dr. Kinnison provided the defense with specific expert testimony that the depth, size, and direction of the three fatal stab wounds were consistent with Michelle having been stabbed by a single individual. (Jan. 28, 2003 Tr. 36-38.) Furthermore, Dr. Kinnison also acknowledged that the sum of Michelle's injuries could have been caused by a single individual. (Jan. 28, 2003 Tr. 39.) ("Yes, the strangulation and the stab wounds all could have been caused by one individual.")

With respect to DNA evidence, the defense presented the expert testimony of Jerry Sellers, a forensic scientist employed by the Commonwealth. Sellers testified that he had recovered the following evidence at the crime scene, which he deemed suitable for DNA testing: a vaginal swab from Michelle, a spermatoza stain on a white blanket that was covering Michelle's body, and material from underneath Michelle's fingernails. Counsel then called Robert Scanlon, a forensic scientist employed by the Commonwealth to testify regarding the results of the DNA analysis. Thereafter, counsel elicited from Scanlon a narrative of the Commonwealth's long and generally fruitless search to find suspects whose DNA would match the DNA material recovered from the crime scene. Scanlon acknowledged that as late as February 18, 1999, although the Commonwealth had provided him with successive suspect lists that included Tice, Williams, Dick, Wilson, Pauley, Farris, and Danser, all of these suspects were eliminated as matches for the DNA recovered from the blanket, the vaginal swab, and from underneath Michelle's fingernails. Scanlon testified that thereafter he was provided with a blood sample from Omar Ballard. On May 6, 1999, DNA tests essentially identified Ballard as the contributor of the DNA material found on the blanket and the vaginal swab. Scanlon further

14

testified that there was a strong statistical association between Ballard's DNA and the DNA material recovered from under Michelle's fingernails. Such testimony was particularly persuasive coming as it did from the Commonwealth's own experts and left the prosecution with little grist for cross-examination.

In light of the foregoing circumstances, counsel were not deficient for failing to move to have the Circuit Court appoint independent DNA and forensic pathology experts. Here, counsel were able to elicit significant, favorable testimony from the Commonwealth's own experts. *See Bower v. Quarterman*, 497 F.3d 459, 471-72 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 2051 (2008); *United States v. McGill*, 11 F.3d 223, 227-28 (1st Cir. 1993) (concluding counsel reasonably declined to call his own expert witness when "by dint of skillful cross-examination of the prosecution's . . . expert," he succeeded "in eliciting much the same opinion evidence that he hoped to establish through his own expert"). Moreover, unlike testimony from an expert hired by the defendant, the experts, who were employed by the Commonwealth, were not open to charges that they had any inclination to shade their testimony to favor the accused. Eschewing independent experts lent significant credibility to the defense's position that the physical evidence exonerated their client, in that this position appeared to be corroborated by the Commonwealth's own experts. Indeed, it was entirely reasonable for counsel to conclude that the marginal value of independent experts could only serve to diminish the potency of the testimony of the Commonwealth's experts whose narrative of events supported the defense's position that investigators had invented the multiple perpetrator theory to cover up for shoddy police work.

Next, Tice faults counsel for failing to move the Circuit Court to appoint an expert in

crime scene reconstruction.  In support of this claim, Tice tendered the affidavit of Larry E.

McCann.  According to the affidavit, McCann has significant experience in criminal

investigations and crime scene investigation.  McCann swears he has reviewed significant

amounts of material pertaining to Michelle's murder, including the crime scene video.  McCann

then generally concludes that, "it is my opinion that only one perpetrator committed the crime

against Moore-Bosko.  It is also my opinion that the crime was not, and could not have been

committed by multiple perpetrators." (State Habeas Pet. Ex. 32, ¶ 6.)  In rejecting this claim, the

Circuit Court concluded that expert testimony would not have been admissible on the issue of

whether the crime scene was consistent with the prosecution's multiple perpetrator theory.

(April 11, 2006 Circuit Court Habeas Order 8.)  That decision certainly appears reasonable in

light of McCann's cursory affidavit, which fails to suggest why a jury could not, from "ordinary

knowledge, common sense, and practical experience," reach a conclusion as to whether the crime

scene was consistent with the prosecution's multiple perpetrator theory. *Compton v.*

*Commonwealth*, 250 S.E.2d 749, 755 (Va. 1979) (internal quotations omitted).

Moreover, "[t]he defense of a criminal case is not an undertaking in which everything not

prohibited is required.  Nor does it contemplate the employment of wholly unlimited time and

resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992).  Here, the Circuit Court had

ruled adversely with respect to counsel's attempts to adduce expert testimony on false

confessions and to introduce a full scale reconstruction of the crime scene.  Counsel therefore

had reason to believe that a motion for the appointment of an expert with respect to crime scene

reconstruction would likely not be successful. *See Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th

16

Cir. 1991) (emphasizing that the Court should consider the "practical limitations" facing defense counsel). It was perfectly reasonable for counsel to decline to seek the appointment of a crime scene reconstruction expert in light of the time and resources that such a motion would require, the marginal value of such expert testimony, and the dim chance the Circuit Court would actually grant the motion. Accordingly, Claim Three will be DISMISSED because Tice has failed to demonstrate any deficiency on the part of counsel.

## V. FAILURE TO FILE A MOTION TO SUPPRESS

In Claim One, Tice contends that counsel were deficient for failing to move to suppress his confession on the grounds that he had invoked his right to remain silent. As explained below, the Court agrees with the Circuit Court that the police violated Tice's right to remain silent under *Miranda*.[7] Additionally, counsel possessed the information necessary to move to suppress Tice's June 28, 1998 confession on that ground, and their failure to pursue such a motion was deficient. Further, had counsel pursued such a motion there is a reasonable probability that Tice would not have been convicted.

### A.    Evidence Pertaining To Tice's Alleged Invocation Of His Right To Remain Silent

On June 25, 1998, at about 2:42 p.m., Tice waived his *Miranda* rights and agreed to speak with Detectives Ray and Ford. (Jan. 28, 2003 Tr. 128.) Tice denied any involvement with Michelle's murder. Detectives Ford and Ray ceased their questioning of Tice at about 3:50 p.m.

Tice was taken to another room at the Norfolk Police Station, where Detective Crank administered a lie detector test. The test took approximately three hours. After the conclusion of

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the test, Detective Crank took notes as he questioned Tice.  Crank's notes reflected the following

exchange:

> I asked him who knocked on the door, said he didn't remember.  He asked me if he
> could have some time to think about it, if he decide to tell me could he talk to me and
> Wray, that he did [not] care for the other guy.  He told me he decide not to say any
> more, that he might decide to after he talks with a lawyer, or spends some time alone
> thinking about it.  I told him he would be given time to think about it.  He *did not*
> request a lawyer.

(State Habeas Petition Ex. 16) (emphasis in original) (capitalization corrected.)  The foregoing

exchange occurred at approximately 7:04 p.m.  (Sept. 12, 2006 Tr. 314-15.)  The Circuit Court

found:

> There apparently was a cessation of the interrogation after petitioner told Crank he
> did not want to say anything else. (Tr. pg. 314).  No attempt was made to "persuade"
> petitioner to reconsider his position, but Crank did not tell Ford and Wray that
> petitioner said that he did not wish to say anything else; it appears they did not know
> it. (Tr. pp. 315-6, 398-400, 458-9).  Ford and Wray resumed the questioning twenty-
> eight minutes after the conclusion of Crank's session with petitioner. (Tr. pp. 253-4,
> 376-7, 453-4, Respondent's Exhibit A).  A significant period of time had not passed.
> No Miranda warning preceded the resumed interrogation, which related to the same
> crimes as the initial interrogation.

(Circuit Court Habeas Op. 7.)  At 7:57 p.m., after a brief spat of crying, Tice began to provide

Detectives Ford and Wray with details of his involvement in the rape and murder of Michelle.

At 11:37 p.m., Detective Ford tape-recorded a statement from Tice detailing his involvement in

the rape and murder of Michelle.  The tape was played at Tice's trial.  Additionally, the statement

(hereinafter the "June 25, 1998 confession") was transcribed and introduced into evidence at

Tice's trial.

### B.    Viability Of A Motion To Suppress

Although law enforcement officers must immediately stop custodial interrogation when the defendant asserts his *Miranda* rights, *see Edwards v. Arizona,* 451 U.S. 477 (1981), they are free to engage in custodial interrogation when they have given *Miranda* warnings and the defendant does not specifically invoke those rights. *See Davis v. United States,* 512 U.S. 452, 460 (1994).[8] "The admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley,* 423 U.S. 96, 104 (1975) (*quoting Miranda v. Arizona,* 384 U.S. 436, 474, 479 (1966)).

Initially, Respondent contends that counsel reasonably declined to pursue a motion to suppress because Tice's invocation of his right to remain silent was conditional and ambiguous. While this Court is not bound by the Circuit Court's decision on the issue of deficiency, *see supra* Part II, the Circuit Court's prediction of the likely success of a motion to suppress in the Virginia courts is persuasive and bears repeating here.

> When a defendant has received a Miranda warning and waived his right to remain silent, as the petitioner did, the waiver will be presumed to continue throughout the interrogation until the defendant "manifests in some way which would be apparent to a reasonable person his desire to revoke it." Washington v. Commonwealth, 228 Va. 535, 548-9, 323 S.E.2d 577, 586 (1984). The Supreme Court of Virginia has adopted the Davis standard in determining whether a suspect has invoked his right to silence. Midkiff v. Commonwealth, 250 Va. 262, 267-8, 462 S.E.2d 112, 115 (1995). In *dictum* there the Court held the statement "I do not want to answer any more questions" would suffice. 250 Va. at 268, 462 S.E.2d at 116. I have found five cases in which the Supreme Court of Virginia has ruled on the

---

[8] In *Davis,* the Supreme Court concluded that the question of whether the defendant sufficiently invoked his right to counsel turns on whether the defendant "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." 512 U.S. at 459.

invocation of the right to silence. In three of those cases, in which the Supreme Court held the statements were equivocal, the statements were significantly different from petitioner's. Midkiff, supra; Lamb v. Commonwealth, 217 Va. 307, 227 S.E.2d 737 (1976); Akers v. Commonwealth, 216 Va. 40, 216 S.E.2d 28 (1975). In Burket v. Commonwealth, 248 Va. 596, 610, 450 S.E.2d 124, 132 (1994), the Court held the statements "I just don't think I should say anything because" and "I need somebody that I can talk to" were equivocal. In Weeks v. Commonwealth, 248 Va. 460, 470, 450 S.E.2d 379, 386 (1994), the Court without discussion held "Do not want to discuss case any further" invoked the right to the [sic] silence. The statement here falls between those in Burket and Weeks, but it is closer to Weeks.

There are two published cases from the Court of Appeals of Virginia on the issue. In Green v. Commonwealth, 27 Va. App. 646, 654, 500 S.E.2d 835, 839 (1995), the defendant's statement he "didn't have anything more to say" was held to be equivocal when considered with his actions. In Mitchell v. Commonwealth, 30 Va. App. 520, 527, 518 S.E.2d 330, 333 (1999), the statement "I ain't go s--- to say to y'all" was held not to invoke the right to silence.

(Circuit Court Habeas Op. 5-6.) The Circuit Court then concluded:

I find the first part of petitioner's statement (when put in the first person) "I've decided not to say any more" was unambiguous and unequivocal. The second part of the statement "I might decide to say more after I talk to a lawyer or spend some time alone thinking about it" did not render the entire statement ambiguous or equivocal. It merely indicated he might be willing to speak at a later time.

The subsequent interrogation of the petitioner after he invoked his right to silence shows that his right to silence was not "scrupulously honored" under Michigan v. Mosley, 423 U.S. 96 (1975) and Weeks, supra. . . . .

Based upon the evidence, I believe a motion to suppress the petitioner's confession would probably have been granted on this ground.

(Circuit Court Habeas Op. 5-7.)

For the reasons stated above, the Court finds that, had counsel filed a motion to suppress Tice's confession based on the failure to honor Tice's invocation of this right to remain silent, the motion would have been granted. *See Campaneria v. Reid*, 891 F.2d 1014, 1017, 1021 (2d Cir. 1989) (concluding defendant invoked his right to remain silent when he stated, "'No, I don't want to talk to you now, maybe come back later.'").

20

## C.    Deficiency Of Counsel

Of course, in the present context, Tice must demonstrate not merely that the motion to suppress would have succeeded, but that counsel were deficient for failing to pursue the motion. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Because "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689 (internal citation omitted).  In light of "the difficulties inherent in making [such an] evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id. (quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  Guided by these principles, the Court will attempt to reconstruct the circumstances pertaining to the failure of counsel to file a motion to suppress.

### 1.    Pertinent evidence from the evidentiary hearing

The following pertinent evidence was adduced at the evidentiary hearing held in the Circuit Court regarding the absence of a motion to suppress based upon Tice's alleged invocation of his right to remain silent.[9]  During those proceedings:

---

[9] Those proceedings were not limited to Tice's current claim that counsel were deficient for failing to file a motion to suppress based on the violation of his right to remain silent.  The hearing also encompassed, *inter alia*, Tice's claims that the counsel should have moved to suppress his June 25, 1998 confession on the grounds that it was involuntary and that said confession was taken in violation of Tice's invocation of his right to counsel.  The Circuit Court rejected both of these claims and Tice did not pursue them further.

21

> Broccoletti stated that he discussed with Tice whether Tice had invoked his *Miranda* rights but could not recall the details of that conversation. However, Broccoletti remembered that Tice did not say that he had invoked his right to remain silent during the police interrogation.
>
> Broccoletti acknowledged that he had received a copy of Crank's notes before Tice's trial and had reviewed every statement Tice made to the police.

*Johnson v. Tice*, 654 S.E.2d 917, 922 (Va. 2008). Mr. Broccoletti candidly admitted that he did not have a specific, independent recollection of reviewing Detective Crank's notes, but he was "sure" that he had reviewed the notes. (Sept. 11, 2006 Tr. 168.) Mr. Broccoletti flatly denied that he was "speculating" about reviewing Detective Crank's notes:

> BROCCOLETTI:        No. I'm not speculating that I reviewed the notes. Because the notes contained, which you showed me this morning, stapled to them is a yellow sheet with my assistant's handwriting on them, which means that we reviewed those notes.
>
> She provided a synopsis of them, if you will. Notes from a detective about a statement the defendant made to him, I would have reviewed with the defendant.

(Sept. 11, 2006 Tr. 169-70.) Additionally, although Mr. Broccoletti could not specifically recall reviewing Crank's notes with Tice, he was confident that he must have done so. (Sept. 11, 2006 Tr. 186-87.)

Nevertheless, despite the apparent viability of a motion to suppress based upon Tice's invocation of his right to remain silent as reflected in Crank's notes, Mr. Broccoletti never considered filing a motion to suppress based upon a *Miranda* violation. (Sept. 11, 2006 Tr. 130, 133.) During the evidentiary hearing, the following exchanges occurred with respect to why counsel had not filed a motion to suppress.[10]

---

[10] Broccoletti explained that for him the term "statements" encompasses Detective Crank's notes about what Tice said because "they're Derek's words, so I consider them to be statements. Maybe that's just a term of art." (Sept. 11, 2006 Tr. 168.)

TICE'S COUNSEL:     And correct me if I'm wrong, but did you also say that you didn't consider filing a motion to suppress based on Miranda grounds?

BROCCOLETTI:     That's correct.

TICE'S COUNSEL:     So is it fair to say that these notes did not factor into any decision whether or not to file a motion to suppress based on the Miranda grounds?

BROCCOLETTI:     I can't say that. Because if I had these notes, as I had the other statements that Derek had made to the police, and I would have meticulously reviewed each one of those statements with him, in terms of their circumstances, how they were taken, where they were taken, in what course of the investigation they were taken.

We had – Mr. Russell and I, had gone to the jail to see Derek [on] countless occasions. And in preparation for both the first and second trials, we conducted mock examinations. Jeff would do the direct and I would do the cross. And we used the statements, obviously, during the course of that, to prepare Derek for the trial, if in fact, he had to testify.

So while I can't tell you specifically that I took these notes and said, Derek, A, B, C, D, or E, I would have had to have done that because I did that with all the statements. That's the best answer I can give you. I'm sorry.

TICE'S COUNSEL:     Mr. Broccoletti, if you had been aware of these notes before Derek's trials, would you have filed a motion to suppress his statement based on Miranda grounds?

BROCCOLETTI:     Let me separate that, if I could. I would not have filed a motion based upon his invocation of rights, because that was never the focus of what Derek had told me during the course of his police interrogation. It was never a circumstance where he said, I asked for a lawyer. I demanded a lawyer. I wanted a lawyer. That was different.

The one part of the notes that do concern me is where he said, "He told me he decided not to say any more." As I go back and look at that now, that statement may have generated something, may have generated a motion.

23

> There must have been some reason I didn't file it. I can't tell you today what that reason is, other than it's something that Jeff and I discussed with Derek and decided based upon whatever he told us, that it wasn't a – it wasn't a fertile ground or a valid ground. But I can't tell you today, six years later, what that reason was.

(Sept. 11, 2006 Tr. 133-35.)

Jeffrey Russell, co-counsel, offered a very different version of events. Contrary to Mr. Broccoletti's suggestion, Mr. Russell, denied ever discussing the possibility of filing a motion to suppress based upon Crank's notes. (Sept. 11, 2006 Tr. 203-04.) Mr. Russell testified that he had never seen Crank's notes prior to the summer of 2006. (Sept. 11, 2006 Tr. 203-04.) Mr. Russell also testified that he was confident that Tice had not informed trial counsel that he had invoked his *Miranda* rights during the police interrogation.[11] (Sept. 11, 2006 Tr. 202.)

### 2.     Respondent's theory that counsel did not file a motion to suppress on *Miranda* grounds for tactical reasons

Although Mr. Broccoletti could not conceive why he did not file a motion to suppress, after the evidentiary hearing Respondent suggested that counsel's decision not to file a motion to suppress was driven by strategic or tactical reasons. Respondent speculates that counsel declined to pursue the motion to suppress Tice's June 25, 1998 confession because the prosecution then might seek to introduce Tice's October 28, 1998 statements, November 5, 1998 statements, and

---

[11] Tice testified that he had discussions with his attorneys about his conversations with Detective Crank. (Sept. 11, 2006 Tr. 276-77.) Tice could not recall that his attorneys had asked him whether he had ever invoked his right to remain silent. (Sept. 11, 2006 Tr. 275-76.) Tice testified that he had not seen Detective Crank's notes prior to the preparation of his state habeas proceeding. (Sept. 11, 2006 Tr. 278-79.) This Court follows the lead of the Circuit Court and assigns little credence to Tice's testimony regarding his conversations with counsel, where it conflicts with the testimony of counsel. Tice's performance throughout his criminal and habeas proceedings establishes that he is not uninclined to testify falsely to the extent that it would serve his own purposes.

his testimony at Danser's preliminary hearing.[12] The record reflects that counsel was very concerned about the introduction of Tice's post June 25, 1998 statements.[13] Broccoletti explained that the "most troubling" of these statements was Tice's November 5, 1998 statement, wherein Tice "had told the police that a black male was involved in the killing, and this was before Mr. Ballard had ever been identified." (Sept. 11, 2006 Tr. 190-91.) Such evidence would be particularly damning to the defense which had two main thrusts: first, that Tice's confession was coerced, and, second, that Tice had no connection to Omar Ballard, the sole perpetrator of the crimes. (Sept. 11, 2006 Tr. 199.)

Thus, Respondent contends that counsel declined to file a motion to suppress because

---

[12] At the time of Tice's trial, Virginia Supreme Court Rule 3A:8(C)(5) provided, in pertinent part:

> Except as otherwise provided by law, evidence of a plea of guilty later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged, or any other crime, or of statements made in connection with and relevant to any of the foregoing pleas or offers, *is not admissible in the case-in-chief* in any civil or criminal proceeding against the person who made the plea or offer.

Va. Sup. Ct. R. 3A:8(C)(5) (Michie 2003) (emphasis added). The parties agree that, for purposes of this rule, Tice's post June 25, 1998 statements were made in connection with his plea agreement. At the time of Tice's trial, the prosecutors were not sure whether the rule permitted them to introduce Tice's post June 25, 1998 statements in their rebuttal case. In light of the uncertainty surrounding the issue, the prosecution decided not to seek to introduce Tice's post June 25, 1998 statements to avoid creating an appellate issue. Subsequent to Tice's trial, the Supreme Court of Virginia clarified that Rule 3A:8(C)(5) permitted the prosecution to introduce statements made by the defendant in connection with a plea offer in its rebuttal case. *See Hood v. Commonwealth*, 608 S.E.2d 913, 916 n.2 (Va. 2005).

[13] During the evidentiary hearing, Mr. Broccoletti stated:

> Well, it wasn't just the confession. It wasn't just the preliminary hearing transcript. There were other statements that Derek had made in debriefings with the police officers that were extremely troubling and extremely frightening.

(Sept. 11, 2006 Tr. 190.)

success on suppression of the June 25, 1998 confession would have placed the defense in the position of choosing between two bad choices. Under the first option, the defense could present no evidence at all, including evidence very favorable to the defense, such as the DNA match for Omar Ballard. Such action would deprive the prosecution of the ability to present any rebuttal evidence, including Tice's subsequent statements. Under the second option, counsel could present evidence favorable to the defense, but face a withering rebuttal from the prosecution on Tice's multiple inculpatory statements. Respondent contends that counsel reasonably chose to avoid this dilemma and simply challenge the veracity of Tice's first confession, which at least could be attacked as the product of overzealous police work.[14]

### 3.   Counsel were deficient

The Court agrees with the Circuit Court's assessment that Tice's attorneys generally represented Tice effectively. (Nov. 27, 2006 Circuit Court Habeas Op. 7.) Nevertheless, a single serious error by counsel may support a claim of ineffective assistance. *See Kimmelman v. Morrison*, 477 U.S. 365, 383-85 (1986). The record here reflects that counsel made such an error.

"A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . .[T]he admissions of a defendant come from the actor himself, the most knowledgeable and

---

[14] Indeed, the transcript of the evidentiary hearing suggested that counsel had secured some sort of an agreement with the prosecution not to introduce Tice's post June 25, 1998 statements. (Sept. 11, 2006 Tr. 189-90.) Accordingly, the Court ordered that the record be expanded to include any information pertaining to this agreement. Thereafter, the prosecutors provided the Court with affidavits wherein they swear that they did not have any express or implied agreement with the defense not to use Tice's post June 25, 1998 statements.

unimpeachable source of information about his past conduct.'" *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (alteration and omissions in original) (*quoting Bruton v. United States*, 391 U.S. 123, 139-140 (1968) (White, J., dissenting)).  Counsel knew from Tice's first trial that Tice's June 25, 1998 confession was the cornerstone of the prosecution's case against Tice.  Although Tice had not told them that he invoked his right to remain silent, that omission alone does not excuse their failure to pursue such a motion.  *See Rompilla v. Beard*, 545 U.S. 374, 387-89 (2005) (concluding client's failure to mention mitigating evidence does not excuse counsel from discovering mitigating evidence in a place he should have looked).  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  Here, any reasonable investigation would not have been confined to interviewing Tice's representations regarding what he told the police, but would have involved reviewing Detective Crank's notes of his conversations with Tice.  *Cf. Rompilla*, 545 U.S. at 385 (observing that "it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to [the prosecution's] case").  As noted above, review of Detective Crank's notes provided an obviously viable ground for suppressing Tice's June 25, 1998 confession.  Nevertheless, no such motion was filed.  Considering the significant benefit to the defense, and the lack of any offsetting cost, the failure to file such a motion falls outside the bounds of reasonably competent performance.[15]  *See Moore v. Czerniak*, – F.3d –, 2009 WL

---

[15] As noted by the Circuit Court, "[a] motion to suppress for violation of petitioner's right to silence could have been presented without revealing trial tactics.  No reason has been offered for the failure to file the motion." (Nov. 27, 2006 Circuit Court Habeas Op. 8.)

27

2231650, at *9-10 (9th Cir. July 28, 2009). Indeed, Mr. Broccoletti was at a loss to explain why he did not file a motion to suppress based upon Detective Crank's notes.

Moreover, the record refutes Respondent's suggestion that counsel made a tactical decision not to file a motion to suppress. Mr. Broccoletti could not recall any reason for not filing the motion to suppress based on Detective Crank's notes, but he indicates that if he had a reason, he must have discussed it with Mr. Russell. Mr. Russell flatly denied ever seeing Detective Crank's notes prior to the state habeas proceedings. Respondent persists that perhaps counsel declined to pursue the motion to suppress to avoid encouraging the prosecution to seek to introduce Tice's post June 25, 1998 statements in their rebuttal case. There is, however, no evidence that such considerations motivated counsel. *See Griffin v. Warden, Md. Corr. Adjustment Ctr.*, 970 F.2d 1355, 1358 (4th Cir. 1992) (noting "courts should not conjure up tactical decisions an attorney could have made, but plainly did not"). In this regard, "[t]olerance of tactical miscalculations is one thing; fabrication of tactical excuses is quite another." *Id.* at 1359 (*citing Kimmelman*, 477 U.S. at 386-87; *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990)). The record indicates that counsel simply overlooked Detective Crank's notes as a basis for suppressing Tice's confession. For the foregoing reasons, the Court finds that counsel were deficient for failing to file a motion to suppress Tice's confession based upon Detective Crank's notes.

### D.    Prejudice

The Supreme Court of Virginia concluded that Tice had failed to demonstrate *Strickland* prejudice. Thus, in order to obtain relief, Tice must demonstrate not only that there is a reasonable probability that with the suppression of June 25, 1998 confession, "the factfinder

28

would have had a reasonable doubt respecting guilt," *Strickland*, 466 U.S. at 695, but also that

the Supreme Court of Virginia's decision to the contrary was objectively unreasonable. *See*

*Wiggins v. Smith*, 539 U.S. 510, 529-30 (2003).  For the reasons set forth below, the Court

concludes that Tice has satisfied these obligations.

The Supreme Court of Virginia provided the following summary of why it concluded

Tice had not demonstrated prejudice:

> Upon this review, we note that Dick admitted at trial that he had not told the truth to the police regarding several details of the crimes. Those details included the room in which the crimes occurred, the question whether Michelle performed oral sodomy on Tice and Williams, and the issue whether Michelle had gained control of the knife and threatened Williams. However, despite these and other inaccuracies in his earlier statements to the police, Dick was consistent in his sworn testimony implicating himself and Tice in the rapes and murder of Michelle, and did not change or retract any aspect of that testimony on cross-examination by Tice's trial counsel.
>
> We also observe that Tice's counsel failed to present any evidence showing that Dick had a motive to fabricate his testimony concerning Tice's role in the crimes.  When Dick gave his testimony at Tice's trial, Dick was serving two sentences of life imprisonment for his crimes against Michelle and was not subject to any additional penalties for those crimes.
>
> Dick's testimony further revealed that he had seen Tice on only one occasion prior to Michelle's murder, and had identified Tice from a photograph that appeared among many other photographs in a Navy yearbook. This evidence established that Dick and Tice did not have a prior relationship that could support a charge that Dick disliked Tice or was otherwise biased against him. Thus, this evidence additionally supported the credibility of Dick's testimony about Tice's participation in the crimes.
>
> Tice's defense at trial was based on the theory that Ballard alone committed the offenses against Michelle.  Tamika Taylor's testimony undermined this theory. Her testimony revealed that Williams had an apparent obsession with Michelle, providing a link to the crimes perpetrated by the group that included Williams, Tice, and Dick. This testimony also was consistent with Dick's testimony that Williams wanted to "go over and see Michelle's panties."
>
> Taylor's testimony also established that Ballard and Michelle were friends, and that Ballard frequently visited Michelle in her apartment. This testimony helped explain Ballard's statement to Detective Peterson that Michelle opened her apartment door to the group that included Ballard, when she earlier had refused entry to the original group.

In addition to the above testimony, the jury also received evidence concerning DNA samples recovered from Michelle's body and from a blanket found on the bed at the crime scene. Forensic scientists Robert Scanlon and Jerry Sellers both testified that intercourse can occur during a rape without DNA material being deposited in a victim's vagina, provided that the perpetrator did not ejaculate. Scanlon further explained a perpetrator would not usually leave epithelial cells containing DNA as a result of sexual intercourse and stated that, thus, "if there is no ejaculation, typically I don't expect to detect anything." This expert testimony, therefore, provided an explanation with regard to how several men could have raped Michelle with only one man, Ballard, having deposited bodily fluids from which DNA samples could be extracted.

We also observe that Tice presented evidence showing that John Danser and Richard Pauley, who were part of the group that Dick implicated in committing these crimes, had produced alibi evidence concerning their activities on the night Michelle was murdered. This evidence, however, did not relate to Tice's activities on the date of the offense and, therefore, was of questionable relevance to the issue whether Tice participated in committing the crimes against Michelle.

With these considerations in mind, and having reviewed all the evidence presented at Tice's criminal trial with the exception of his confession, we conclude that the circuit court erred in holding that Tice satisfied his evidentiary burden under *Strickland*.

*Tice*, 654 S.E.2d at 924-25.

Obviously, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. As acknowledged by the Supreme Court of Virginia, in the absence of Tice's confession, Dick's testimony was the only significant evidence of Tice's guilt. Nevertheless, the foregoing summary by that court only hints at how substantially Dick's testimony was impeached. Moreover, as explained below, considering the dearth of evidence of Tice's guilt[16] against the

---

[16] In concluding that Tice had demonstrated prejudice the Circuit Court observed that "[t]here was no fingerprint, DNA, or other scientific evidence against him; no independent eyewitnesses implicated him; no physical evidence directly implicated him." (Nov. 27, 2006 Circuit Court Habeas Op. 8.)

significant evidence consistent with Tice's asserted innocence, a reasonable juror would have had grave doubts about Tice's guilt.[17]

### 1.    The prosecution's first four witnesses

The prosecution called only six witnesses:  William Bosko, Tamika Taylor, Wayne Bryan, Elizabeth Kinnison, Joseph Dick, and Detective Robert Ford.  Bosko and Taylor did not provide any evidence directly linking Tice with the crime.[18]

Bryan, a forensic scientist, provided evidence regarding the condition of the crime scene and items recovered from the crime scene.  Bryan did not provide any testimony that linked Tice to the crime.  Bryan testified that he recovered five fingerprints from the crime scene that did not match Mr. or Mrs. Bosko.  Bryan testified that he compared those five fingerprints to fingerprints from Tice, Dick, Williams, Danser, and Pauley, but they did not match.  (Jan. 27, 2003 Tr. 215.) Additionally, the pictures of the crime scene introduced by Bryan depicted an orderly apartment that was hard to square with the prosecution's theory of an eight-person rape and murder. (Jan. 27, 2003 Tr. 225-27.)

The testimony of the prosecution's next witness, Dr. Kinnison, would have left a reasonable juror with more, rather than less, doubt about the prosecution's multiple perpetrator theory and Tice's guilt.  Dr. Kinnison testified that Michelle likely had been raped prior to her murder.  Dr. Kinnison also testified that Michelle had died from multiple stab wounds and

---

[17] Although not repeated here, the Court acknowledges the evidence of Tice's guilt cited by the Supreme Court of Virginia and recited previously.

[18] As previously noted, Taylor's testimony indicated that Williams was obsessed with Michelle.

31

manual strangulation.[19] Nevertheless, on direct examination Dr. Kinnison did not provide any testimony that directly linked Tice to the murder.

On cross-examination, one was left with significant questions as to how the medical evidence squared with the prosecution's theory that seven or eight men had taken turns stabbing Michelle.[20] Specifically, Dr. Kinnison acknowledged that the three fatal wounds to the chest cavity were closely grouped, entered in the same general direction and were "virtually identical" in depth. (Jan. 28, 2003 Tr. 36.)  Dr. Kinnison further acknowledged that "the strangulation and the stab wounds could have been caused by one individual." (Jan. 28, 2003 Tr. 39.)  Throughout her testimony, Dr. Kinnison was reluctant to offer an opinion as to whether the medical evidence was more consistent with an attack by a single individual rather than by multiple individuals. Nevertheless, she acknowledged that, on July 9, 1997, when she conducted Michelle's autopsy, consistent with the then prevailing police theory, her impression was that the crime was committed by a single individual.

MR. RUSSELL:        And in the course of your examination and autopsy, you found no medical evidence that was contrary to that proposition that there was one perpetrator?

DR. KINNISON:        It was consistent with one person.  I had no problems with that being one.

MR. RUSSELL:        If you had found evidence during your autopsy to suggest to you that the injuries that she sustained were

---

[19] Specifically, Dr. Kinnison testified that Michelle had three stab wounds that punctured the lung, a fourth that punctured the skin and tissues underneath the skin, and five small nicks, which were "consistent with just the point of the knife just breaking the surface of the skin." (Jan. 28, 2003 Tr. 26.)

[20] Dick testified that Wilson left before the stabbing.

32

> inflicted by more than one person, I assume you would have told the police that?

DR. KINNISON:     I would have expected that I would have said something, told Investigator Evans or Corporal Davies.

MR. RUSSELL:     And you did not do so?

DR. KINNISON:     To the best of my knowledge, I didn't indicate I thought it was more than one assailant.

(Jan. 28, 2003 Tr. 46-47.) In sum, after hearing Dr. Kinnison's testimony and the prior three witnesses, a juror would still have grave doubts as to why he or she should credit the prosecution's theory that the crimes against Michelle were committed by Tice and seven other men when there did not appear to be physical or testimonial evidence to support that theory. With the exclusion of Tice's confession, convincing testimony from Dick was the only means available to silence those doubts and tie together the prosecution's case.

### 2.     Joseph Dick

In concluding that Dick was a sufficiently convincing witness, the Supreme Court of Virginia overstates Dick's apparent impartiality and glosses over the numerous inaccuracies and inconsistencies in Dick's account of the crime. For example, the Supreme Court suggests a juror would have no reason to believe Dick had an ulterior motive for testifying against Tice. It is true that Dick initially denied that he had been offered any promises or deals in exchange for his testimony. Nevertheless, he then conceded that he had entered into a plea agreement with the prosecution wherein his charge of capital murder, with a possibility of a sentence of death, was reduced to a charge of first degree murder. Dick admitted that, as part of the plea agreement, he was obliged to testify against his codefendants, including Tice. Although the Supreme Court of

33

Virginia concluded that Dick could not face any additional penalties if he failed to testify against

Tice, Dick himself did not seem quite so sure.

| | |
|---|---|
| BROCCOLETTI: | Aren't you under an obligation to testify? |
| DICK: | Yes, I'm under obligation, but I also want to. |
| BROCCOLETTI: | And if you failed to testify, Mr. Dick, you breached or broken your plea agreement haven't you? |
| DICK: | I've got no idea about that. |
| BROCCOLETTI: | And if you break or breach your plea agreement, could you then be facing the death penalty again? |
| DICK: | I don't know. |

(Jan. 28, 2003 Tr. 68-69.)

Thereafter, counsel elicited from Dick the development of his current version of the

crime. As discussed below, that testimony was not indicative of a remorseful individual who

was seeking to clear his conscience. Rather, it reflected that Dick only had admitted to his

involvement in the crime when pressed by the police. Thereafter, Dick had provided the police

with a long series of different descriptions of the crime and settled on his current testimony

because the police were satisfied with that account.

### (a)    Dick's first version

During cross-examination, Dick acknowledged that from July 8, 1997, until January 12,

1998, he did not tell the authorities of his involvement in the murder and rape of Michelle. On

the morning and afternoon of January 12, 1998, when Dick was questioned by the police, Dick

repeatedly denied any involvement in the crime and stated he was on his ship. Sometime after

2:00 p.m., after reviewing a picture of how Michelle appeared when found by the police, Dick

admitted that he was in Michelle's apartment with Williams on the night of the rape and murder, but that he had not participated in either crime. Dick then stated that he had watched Williams sodomize and rape Michelle and then Dick had left the apartment.

### (b)   Dick's second version

Mr. Broccoletti then walked Dick through what he had told the police about an hour after his first statement. Dick acknowledged that he initially stuck to his first version of the events, but conceded to his involvement in the rape when Detective Ford predicted that the DNA evidence would show that Dick's penis had been inside of Michelle's vagina. (Jan 28, 2003 Tr. 79.) Dick then admitted to raping Michelle, but stated that he had stabbed Michelle only after she had attacked Williams with a knife. Dick indicated that the stabbing had been an accident. Dick represented that Michelle initially consented to Williams's sexual advances. Dick told the police that things had started in the living room, but that he could not remember if the rape and murder had ended in the living room or dining room. Dick also acknowledged that, during this version, he falsely represented that he had ejaculated and wiped himself off on a blanket. Dick did not mention Wilson, Tice, Farris, Pauley, Danser, or Ballard.

### (c)   Dick's third version

Counsel then confronted Dick with his statement made on April 27, 1998. Dick acknowledged that on that date he was again questioned by the police because his DNA had not matched the DNA found at the crime scene. When the police asked Dick who else was present on the night of the murder, Dick identified Wilson. Dick told the police that he, Williams, and Wilson had gone to Michelle's apartment between 7:00 and 8:00 p.m. on the night of the

murder.[21] Dick acknowledged to counsel that, during this statement, he retracted his prior

statement about ejaculating in Michelle's mouth because he knew that the police had not found

his DNA at the crime scene. Dick stated that only Williams had done the stabbing and that

Williams and Wilson had tried to remove her body from the apartment. Dick further told the

police that neither he, nor Williams, nor Wilson used a condom. Dick further represented that

Wilson had attempted to clean the murder weapon. Dick did not mention Tice, Farris, Pauley,

Danser, or Ballard.

### (d) Dick's fourth version

On June 16, 1998, the police once again came back to question Dick because Wilson's

DNA had not matched the DNA found at the crime scene. This time Dick told the police that a

total of six people had been involved in the crime, but that he did not know the names of these

other three men. During this version, Dick continued to assert that there had been some effort to

remove the victim's body from the apartment.

### (e) Dick's testimony from the preliminary hearing

Counsel next confronted Dick with his testimony from the August 25, 1998 preliminary

hearing. Dick acknowledged that, although he was under oath, he had testified untruthfully about

the men involved in the crime. Specifically, Dick acknowledged that at the preliminary hearing

he had specifically denied that a black man was involved in the crime. Additionally, at the

preliminary hearing, Dick did not mention any pact to remain silent or that he feared saying

---

[21] Dick's assertion in this version that the attack on Michelle began between 7:00 and
8:00 p.m. is contradicted by Tamika Taylor's testimony that she was with Michelle around 11:00
p.m. on July 7, 1997. (Jan. 27, 2003 Tr. 153.)

anything about the crime because of Ballard. Rather, Dick acknowledged that at the preliminary hearing he represented that he was afraid for his family.

### (f)   Dick's statements preceding the trial

Counsel also confronted Dick with a letter that he had written to a television station in 2000 or 2001. In that letter, Dick denied having participated in the rape and murder of Michelle and stated, "I told the police anything they wanted to hear just to get them off my back." (Jan. 28, 2003 Tr. 104). Dick further acknowledged, that just two days prior to his current testimony, he had told Tice's counsel that he was not present when the crime was committed. (Jan. 28, 2003 Tr. 108.)

### 3.   Assessment of the prosecution's case without Tice's confession

The Circuit Court observed that Broccoletti's cross-examination of Dick "seems quite damaging." (Nov. 27, 2006 State Habeas Op. 9.) That is an understatement. Confronted with the history of the meandering development of Dick's account of the crime and Dick's expressed willingness to tell the police anything they wanted hear, a juror would have significant questions about the veracity of Dick's testimony. With the suppression of Tice's confession, the only remaining evidence of Tice's guilt was Tice's admission to Detective Ford that he knew Williams.[22] That evidence was not sufficient to extinguish a reasonable juror's doubts about Tice's guilt. Indeed, the doubts about Dick's veracity and Tice's guilt could only become more profound as the jury heard the DNA evidence, Ballard's admissions, and the significant alibi for two of the individuals Dick asserted were involved in Michelle's rape and murder.

---

[22] The prejudice analysis necessarily excludes Detective Ford's testimony regarding Tice's June 25, 1998 confession. Nevertheless, because Tice admitted to knowing Williams before invoking his right to remain silent, Detective Ford could testify to that admission.

### 4.    The defense's DNA evidence and Ballard's admissions

Dick insisted that he, Williams, Wilson Tice, Danser, Pauley, Farris, and Ballard each raped Michelle. Nevertheless, Dick, Williams, Wilson, Tice, Danser, Pauley, and Farris were eliminated as the contributors of the DNA found in Michelle's vagina, on the blanket that had been laid over her body, and for the material underneath her fingernails. As recounted above, the police's fruitless search for the source of the DNA ended only when Omar Ballard volunteered that he had killed Michelle. Although Dr. Scanlon testified that, "if there is no ejaculation, typically I don't expect to detect anything," that statement does not suffice to silence the reasonable questions raised by the DNA evidence. (Jan. 28, 2003 Tr. 313.) For one thing, it does not explain why, if eight men were holding Michelle down, only Ballard's DNA tissue was recovered from underneath Michelle's fingernails. Moreover, the fact that only Ballard left traces of his participation in the rape and murder seems inconsistent with Dick's already bizarre account of a gang of men driven by lust to serially rape and stab Michelle. While it is possible that the crime transpired as Dick testified, the presence of only Ballard's DNA in the victim's vagina and under her fingernails poses troubling questions for a juror seeking certainty of Tice's guilt beyond a reasonable doubt.

Furthermore, Omar Ballard's admissions to his involvement in the rape and murder sow additional confusion as to whether he acted alone or in concert with Tice, Dick, Williams, Wilson, Danser, Pauley, and Farris or any combination thereof. On March 4, 1999, when confronted with DNA evidence linking him to the crime, Ballard confessed to stabbing Michelle. Ballard denied that anyone else had participated in the crime. Ballard further denied that the seven other people who had been charged with the crime had been involved. On March 11,

38

1999, Ballard gave another statement to the police wherein he stated that he had raped, stabbed, and choked Michelle. Ballard did not indicate that anyone else was involved in the crimes.

On March 15, 2000, a week before he pled guilty, Ballard finally provided the police with a statement that was somewhat consistent with the prosecution theory that Ballard had not acted alone in raping and murdering Michelle. Nevertheless, even in that statement Ballard only "mentioned . . . four other people" and "never mentioned being with seven other people." (Jan. 29, 2003 Tr. 44.)

### 5.    Alibi evidence tending to undermine Dick's account of the crime

As noted above, in his testimony at trial, Dick insisted Michelle had been attacked by himself, Tice, Williams, Wilson, Ballard, Farris, Pauley, and Danser on the night of July 7, 1997. In opposition, the defense introduced largely uncontroverted evidence that indicated both Danser and Pauley were not at Michelle's apartment on the night of the murder. Danser testified that he was in Warminster, Pennsylvania, on July 7, 1997. Danser stated that he worked until 6:30 p.m. repairing an air conditioning unit in a residence. After work he went home and then went out drinking with friends in Philadelphia, Pennsylvania, until about 2:00 a.m.[23] A few hours later, at 7:30 a.m., Danser checked back into work.

---

[23] During his examination of Danser, counsel refreshed Danser's recollection with time sheets and work orders from Danser's place of employment in Pennsylvania. (Jan. 29, 2003 Tr. 50-56, 64-66.) Additionally, counsel refreshed Danser's recollection of what time he went out drinking with friends in Philadelphia with the use of Danser's automatic teller ("ATM") withdrawals for the evening of July 7, 1997. (Jan. 29, 2003 Tr. 62-63.) Although neither the work records nor the ATM withdrawal record were introduced into evidence, Danser's reference to these documents tended to create the impression that there was objective verification for his testimony that he was in Pennsylvania on the evening of July 7, 1997.

Richard Pauley's parents, Judy and Richard Pauley, testified that their son was home all night on July 7, 1997. Specifically, Judy Pauley testified that her son arrived home from work around 6:30 p.m., ate dinner, used the computer, and then began talking to his then-girlfriend, who lived in Australia. Ms. Pauley recalled from the phone records that her son's phone call started around 11:00 p.m. and lasted a couple of hours. She recalled seeing her son the next morning when she woke up.[24] Although the foregoing testimony did not provide Tice with an alibi, it certainly tended to undermine confidence in Dick's already impeached account of the crime.

### 6.    Conclusion

Tice's June 25, 2008 confession provided compelling evidence of his guilt. With the exclusion of that evidence, the prosecution's case against Tice would be left awash in doubt.

There was no physical evidence linking Tice to the crimes or suggesting that Tice acted in concert with the individuals who had committed the crimes. Indeed, the physical evidence tended to refute the theory that the rape and murder had been committed by multiple individuals. Although the prosecution alleged that eight men had crowded into the bedroom to rape Michelle, and then took turns stabbing her, there was remarkably little sign of such violent activity by so many men in such a confined space. Furthermore, the wounds to Michelle did not indicate that she had been the victim of serial stabbing by seven or eight different individuals. Additionally, while multiple DNA deposits were found at the crime scene, they were traced only to one individual, Omar Ballard.

---

[24] Mr. Pauley also testified that his son was not able to drive in July of 1997 because he had lost his license and that he did not hear any cars come by the home to pick up his son. (Jan. 29, 2003 Tr. 100, 104.)

40

In the absence of Tice's confession, his conviction would have hinged on Dick's credibility.  Considering the variety of accounts Dick had provided and the lack of any significant corroboration of his testimony that Tice had participated in the crime, a reasonable juror would have grave doubts as to Dick's veracity regarding Tice's participation in the crime.  Any confidence in Dick's testimony that Tice participated in the crimes would be further shaken by the defense evidence that indicated that Dick had falsely implicated Danser and Pauley in the commission of the crimes.  The Supreme Court of Virginia's conclusion that there was no reasonable probability of a different result if Tice's confession had been excluded is objectively unreasonable.  *See* 28 U.S.C. § 2254(d)(1).  Tice's petition for a writ of habeas corpus will be GRANTED with respect to Claim One.  The parties will be DIRECTED to submit further briefing with respect to the form of the Order granting Tice relief with respect to Claim One.

The motion to dismiss (Docket No. 10) will be GRANTED IN PART AND DENIED IN PART.

An appropriate Order shall issue.

Dated: SEP 1 4 2009
Richmond, Virginia

/s/
Richard L. Williams
United States District Judge